**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| HORIZON GLOBAL AMERICAS INC., Plaintiff, | ) | CASE NO.: 1:20-CV-00310-PAB |
| v. | ) | JUDGE PAMELA A. BARKER |
| NORTHERN STAMPING, INC., Defendant. | ) | **HORIZON GLOBAL AMERICAS INC.'S REPLY IN SUPPORT OF MOTION FOR PROTECTIVE ORDER AGAINST NSI'S SUBPOENA TO ERIC STANIFER** |

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, plaintiff Horizon Global Americas Inc. ("Horizon") hereby respectfully submits this reply in support of its motion for a protective order to prohibit the deposition of non-party Eric Stanifer ("Stanifer"),[1] the inventor who defendant Northern Stamping, Inc. ("NSI") already deposed on the same issues during the *inter partes* review ("IPR"). There is no reading of Mr. Stanifer's prior deposition transcript that leaves open for additional questioning any of the subjects that NSI claims it wishes to address with him. An additional deposition, three years after Mr. Stanifer's 2022 deposition, even further away from the original 2008 invention, and duplicating topics previously exhausted cannot reasonably be expected to yield relevant, non-cumulative testimony.

In its opposition, NSI unintentionally continues to refute its own argument for discovery,

[1] Mr. Stanifer is no longer employed by Horizon. He is employed by Lippert Components, Inc., which purchased another competitor against whom Horizon has pending litigation in December 2019. Dkt 105-1 at PageID #: 3886,10:2-10; *see* https://corporate.lippert.com/news/press-releases/lippert-components-completes-acquisition-of-curt-group, announcing December 19, 2019 acquisition of CURT Group. While it appears that NSI has had *ex parte* communications with Mr. Stanifer and/or his lawyer and claims Mr. Stanifer "agreed to his deposition" (Dkt 107 at PageID#: 4041), Mr. Stanifer declined to speak with Horizon, so it is unable to confirm whether Mr. Stanifer simply does not want to disobey a subpoena and/or agreed to a particular date for his deposition. But Horizon's interests in its privileged discussions with Mr. Stanifer and the burden of participating in a cumulative deposition are sufficient to provide it with standing under both Rules 26 and 45, regardless of Mr. Stanifer's willingness to obey a subpoena.

representing that the existing record already proves its entitlement to attorney fees. More, as shown below, it already extensively covered the subjects on which it says it wants to question Mr. Stanifer in his 2022 deposition. The Court should reject NSI's attempt to turn a post-judgment fee dispute into a side show that eclipses the main event.

**A. NSI Misrepresents Horizon's Positions in Prior Briefing.**

NSI's opposition attacks straw men. Horizon has never argued that the Court lacks subject matter jurisdiction to entertain a properly filed fee motion. Horizon has never altered its positions that:

- There is no jurisdictional basis for NSI's discovery unless it is requested and granted after a fee motion is filed (*see*, *e.g.*, Dkt 100 at PageID #: 3729, 3733; Dkt 104 at PageID #: 3782–84; Dkt 105 at PageID #:3871–72);
- The Court lacks subject matter jurisdiction over NSI's counterclaims (*id.*; *see also* Dkt 96; Dkt 106); and,
- The Court should exercise its discretion to dispose of any motion by NSI under § 285 without discovery for the sake of judicial efficiency (*see*, *e.g.*, Dkt 105 PageID #: 3872; Dkt 106 at PageID #: 4028–29, 4032–35).

NSI rails against its fabricated arguments but makes no effort to rebut the points Horizon actually argued.

NSI also misstates dicta in *Accordant* to argue that jurisdiction over NSI's inequitable conduct counterclaims persists because of its (still) anticipated fee motion. That is not what Judge Gaughan said or ordered. Judge Gaughan ***dismissed*** the counterclaims. In dicta, she observed that she would have to declare the patent unenforceable if she *later* found inequitable conduct as a result of any fee motion Vexor might file.

> In the event the Court finds that a party engaged in inequitable conduct, the district court must declare a patent unenforceable. . . Although there is some disagreement on this issue . . .the fee motion is the jurisdictional "hook" that gives the Court the power to declare a patent invalid when no other "case or controversy" exists. Accordingly, the Court will dismiss the counterclaims and allow defendant to file a motion pursuant to 35 U.S.C. § 285 in which defendant may argue that plaintiff's inequitable conduct warrants a declaration of unenforceability.

*Accordant Energy, LLC v. Vexor Technology, LLC*, 364 F.Supp.3d 780, 786 (N.D. Ohio 2019) (citations omitted). But the case never reached that point because, unlike NSI here, Vexor put judicial efficiency ahead of its disappointment at having to defend claims of infringement. The Court never weighed the ramifications of conducting discovery and trial solely for a § 285 motion,[2] the right to a jury trial on subsidiary fact issues,[3] or the impact of the defendant's burden of proof on a summary determination of previously undetermined disputed facts and indispensable questions of law (such as construing patent claims) under § 285.

Despite all its briefing over the past month and a half, NSI still has not cited any case that allowed mooted counterclaims to provide jurisdiction for discovery while in anticipation of a motion for attorneys' fees. This is unsurprising because NSI's novel approach stands principles of jurisdiction and rules of procedure on their heads. Once judgment is entered, NSI has fourteen days to move for attorneys' fees under §285. Fed. R. Civ. P. 54(d)(2)(B) (requiring motions for attorney fees be filed no later than fourteen days after entry of judgment); *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1386 (Fed. Cir. 2005) ("No provision in section 285 exempts

[2] The Court did, however, telegraph its disapproval of fee-related discovery, warning "[a]s noted by the Court in *National Products*, the court need not 'allow fee litigation to be the tail that wags the dog.'" *Accordant*, 364 F.Supp.3d at 786, quoting *Nat'l Prods, Inc. v. Gamber-Johnson, LLC,* 2008 WL 11343465 at *5 (W.D. Wash. April 23, 2008).

[3] While the Federal Circuit held that there is no right to a jury trial on inequitable conduct claims, *see Am. Calcar, Inc. v. Am. Honda Motor Co*., 651 F.3d 1318, 1333 (Fed. Cir. 2011), the Supreme Court recently ruled in *Sec. & Exch. Comm'n v. Jarkesy*, 603 U.S. 109, 125, 144 S. Ct. 2117, 2130, 219 L. Ed. 2d 650 (2024) that a Seventh Amendment right to a jury trial exists with respect to SEC enforcement proceedings seeking monetary remedies and sounding in fraud. This same reasoning would require a jury trial on the issues of materiality and intent in NSI's inequitable conduct allegations, particularly if the Court took the step of declaring the 050 Patent unenforceable.

requests for attorney fees thereunder from compliance with Rule 54(d)(2)(B).”). At present, there is no case or controversy before the Court, no claim as to which discovery could be relevant. The counterclaims are moot, and no fee motion has been filed.

NSI cannot stand exclusively on moot counterclaims and seek attorneys’ fees, let alone take discovery in its present procedural posture.

**B. NSI Misrepresents Mr. Stanifer’s Prior Deposition.**

NSI’s claim that it was never able to question Mr. Stanifer regarding alleged inequitable conduct (Dkt 107 at PageID #: 4042) is complete fiction on two counts. First, while NSI argues that IPR rules limited it to questioning Mr. Stanifer about matters contained in his IPR declaration, that declaration addressed conception and reduction to practice. (*See* Ex. C.[4]) Second, NSI repeatedly went outside the scope of that declaration, leading to more than one hundred objections that the questioning was “outside the scope.” (*See generally*, Ex. A, Dkt 105-1.) NSI ignored those objections, repeatedly and extensively questioning Mr. Stanifer about all the subjects that NSI asserts demonstrate inequitable conduct: conception, his 37 C.F.R. §1.313 Declaration, and Cequent’s work with Ford and Mr. Withers. NSI therefore thoroughly deposed Mr. Stanifer on the *exact* topics it now claims it must raise in another deposition.

NSI first claims it “would have liked to ask Mr. Stanifer questions related to his intent in filing the sketch as proof of conception.” (Dkt 107 at PageID #: 4042.) But it already did that. Counsel for Horizon then re-directed the witness, and NSI’s attorney conducted a re-cross. The deposition contains more discussion of conception than can be cited, including these examples:

> **Q:** And do you understand that the – this declaration [with the conception sketch as declaration Exhibit A] was being submitted in order to predate Withers’s application, which was being used to reject your claims?

[4] For completeness, Horizon includes Mr. Stanifer’s IPR declaration as **Exhibit C** (continuing the identification of exhibits from its original motion).

**A:** I was making the assumption that it was, yes.

(Dkt 105-1 at PageID #: 3914, 38:6–11 (cleaned up).)

**Q:** In the second paragraph of the section under number 3, you state, "The drawings of Exhibit A demonstrate our conception of the claimed subject matter before the effective date of Withers of May 30th, 2008." Do you see that?
**A:** Yes, I do.
**Q:** And the drawings of Exhibit A are the sketches on page 550,[5] correct?
**A:** Correct.
**Q:** Now, knowing that the sketches don't show the receiving members, do you believe that that statement was accurate?
**A:** Yes, I do.
**Q:** Why is that?
**A:** Because if you look at the sketch on page 550, the four end components were the beginnings of the receiving member design. Those were cast components where we would integrate in – the puck into those for the final version of the receiving member.
**Q:** So this shows you that you believed you were in possession of the puck idea as of this date, right?
**A:** Correct.

(*Id*. at PageID #: 3915–16, 39:4 – 40:8 (cleaned up).)

**Q:** Can you identify the receiving members in Exhibit 3 [conception sketch].
**A:** On the drawing, they're labeled RF, RR, LF, and LR (indicating).
**Q:** If you go to exhibit -- the patent, Exhibit 4 – that's Exhibit 2 [the 585 Patent] -- Figure 4 is on page 7. Let me know when you're there.
**A:** Okay.
**MR. ABDELNOUR**: Hold on one second. Where are we? I'm sorry. Where are we?
**MR. KURK**: Mr. Stanifer has Exhibit 3 in front of him and Figure 4 of Exhibit 2 [the 585 Patent].
**MR. ABDELNOUR**: Okay.
**Q:** You would agree that Exhibit 3 [conception sketch] does not show the receiving members as shown in Figure 4 [of the 585 Patent], correct?
**MR. ABDELNOUR**: Objection. Form. Leading.
**A:** Yes, that is correct.
**MR. KURK**: Let me state that -- fix the leading.
**Q:** Does Exhibit 3 [conception sketch] show receiving members?
**A:** Yes, it does.
**Q:** Are those receiving members the same as in Figure 4 [of the 585 Patent]?
**A:** No, they're not.

---

[5] The pages refer to the deposition exhibit containing the file history of the 585 Patent; pages 547 through 550 were Mr. Stanifer's Rule 131 declaration and the conception sketch exhibit.

(*Id*. at PageID #: 3973, 97:9–98:10 (cleaned up).)[6]

> **Q:** If you look at Stanifer Deposition 3 -- this is that early sketch --
> **A:** Uh-huh.
> **Q:** -- you pointed to RF, FR, and then, looks like, LR [sic] and LR. What do those stand for?
> **A:** Rear -- excuse me. Front right, rear right, left front, left rear.
> **Q:** Okay. They're not – they're not labeling – they're not labels for the receiving member, correct?
> **A:** Well, that -- where they're notated on the drawing is next to the receiving members, but that's the location that they -- that it sits on the vehicle.
> **Q:** Now, we talked about this and agreed that there's no pucks shown in this drawing, right?
> **A:** That is correct.
> **Q:** So is it your testimony that there is a receiving member shown in this drawing?
> **A:** Yes.
> **Q:** What is the receiving member?
> **A:** It's labeled as RF, RR, LF, and LR. They receive the pucks. The pucks would be bolted into those members so that you could attach the fifth wheel to them.
> **Q:** So is there a structure there that you're pointing to or just generally the concept?
> **A:** Structure.
> **Q:** Which structure?
> **A:** It looks like it has the Mickey Mouse ear. If you're looking at RF in the lower left-hand corner, that ear sticking out there, coming back with the line going across and the oblong shape in the middle with the rounder hole, that is -- that is the -- that is a cast structure, and then it's the same on all four -- on the other three ends as well.
> **Q:** And those serve as the receiving member in this version?
> **A:** Yes.
> **Q:** So these structures include holes, right?
> **A:** Correct.
> **Q:** These are different receiving members than that shown in Figure 4. I think that was your testimony earlier, correct? Figure 4 of your patent.
> **A:** Yes, that is correct.
> **Q:** Okay.
> **MR. ABDELNOUR**: Nothing further.

(*Id*. at PageID #: 3982–84, 106:15–108:13. *See also id*. at PageID #: 3908–09, 32:3–33:8 (discussion of conception sketch (deposition Ex. 3) and receiving members); PageID #: 3909–21,

[6] This and subsequent lines of questioning emphasize how NSI has misread a particular, pre-existing Horizon "puck" into a patent claim that does not require a puck. Rather, the claim requires "receiving members [that] are configured to engage a respective leg of a fifth wheel hitch," which is precisely what Mr. Stanifer describes as adjacent to the letters "RF, RR, LF, and LR."

33:9–45:14, *et seq*. (extensive discussion of Mr. Stanifer's Rule 131 Declaration (deposition Ex. 4) submitting the conception sketch, confirming sketch of deposition Ex. 3 matches sketch in declaration (*id*. at PageID #: 3911, 35:8)); PageID #: 3916, 40:8 (verifying conception of receiving members as of date claimed); PageID #: 3957–66, 81:2–90:23 (returning to discussion of Mr. Stanifer's Rule 131 Declaration throughout).)

NSI next claims it "would also like to ask Mr. Stanifer how he and Horizon sought a patent for the very same invention for which Ford had already filed a patent application." (Dkt 107 at PageID #: 4042.) NSI also already asked about this, lodging over 30 questions specifically mentioning Ford and nearly 20 specifically naming Mr. Withers, as well as engaging in extensive discussion related thereto. For example:

> **Q:** Did you share your idea or conception of that idea in April, May 2008 time frame with Sean Withers at the time you had -- at the time you conceived of it?
> **A:** No, we did not.
> **Q:** Did you share it with Mr. McCoy?
> **A:** It was Mr. McCoy and myself's idea at the time. We were working in conjunction with each other on that.

(Dkt 105-1 at PageID #: 3897–3898, 21:25–22:8.)

> **A:** At the time, when we filed the patent application for this, I had no knowledge that Mr. Withers was trying to receive a patent for it as well. . . when the original patent application was filed, I had no knowledge that Mr. Withers was trying to receive a patent for -- for Mr. McCoy and myself's design.

(*Id*. at PageID #: 3920, 44:6–9. *See also*, *id*. at PageID #: 3919–20, 43:24–44:1.)

Moreover, Mr. Stanifer's declaration speaks for itself: He believed, at the time of his declaration and when deposed, that he and Mr. McCoy, not Mr. Withers, invented the solutions claimed in the patents-in-suit.

NSI finally claims it would like to ask "why, when the patent examiner identified that Ford application as making Horizon's unpatentable, Mr. Stanifer and Horizon remained silent regarding

their relationship with Ford."[7] (Dkt 107 at PageID #: 4042.) They already asked Mr. Stanifer that exact question more than once.

> **Q:** Staying on your 131 declaration, Exhibit 1004 [in the IPR], Mr. Stanifer, the declaration doesn't inform the PTO that Cequent and Ford and, specifically, Mr. Withers were working together on an underbed hitch mounting program, does it?
> **A:** No, it does not.
> **Q:** Was it your decision not to include that information?
> **A:** I do not know on that one.
> **Q:** You'd agree with me, however, that it would be material to the patent office to know that you and Mr. Withers were working on a joint underbed hitch mounting program when determining who gets priority of invention, correct?
> **MR. KURK**: Objection. Form. Calls for a legal conclusion. Relevance. Outside the scope. And, again, to the extent your answer would reveal attorney-client communications, I'd advise you not to answer it. With that said, you can answer.
> **A:** I don't want to answer that.
> **Q:** What's the basis for not answering?
> **A:** Mr. Withers and myself were working on this, but it was mainly – mainly myself and Rick McCoy were doing all of the work for this. Sean Withers had zero say in the design, what it ended up looking like. The only information he had the final say in was if it fit in their package.
> **Q:** Would you agree with me that it was -- that it would at least be material to the patent office to know that Mr. Withers and you and Mr. McCoy were working together on an underbed hitch mounting project -- for purposes of determining priority of invention?
> **A:** I do not know because I don't know the full patent situation, how stuff gets filed and all of that. So, I mean, that's kind of what – you know, Mr. Kurk and you guys handle all that information. So I really don't know how to answer that question, so…
> **Q:** You're the inventor on a number of patents, correct, Mr. Stanifer?
> **A:** Correct.
> **Q:** At least five or six?
> **A:** Yes, but I -- I don't know the exact number for those.
> **Q:** And when you sign on as an inventor to a patent application, you understand you have a duty to disclose to the patent office any material information about the patentability of your invention, correct?
> **A:** Yes.
> **Q:** Would you agree with me that the fact that you were working with Mr. Withers and Mr. McCoy and that both you and Mr. Withers had patent applications would be a material fact to disclose to the patent office in connection with determining whether Mr. Withers' application or yours should get priority?
> **A:** At the time, when we filed the patent application for this, I had no knowledge

[7] Besides being duplicative, this line of questioning is also improper as irrelevant and misleading to suggest there is a duty to disclose customers, clients, or business relationships to the U.S. Patent and Trademark Office ("USPTO"). *See* 37 C.F.R. § 1.56.

that Mr. Withers was trying to receive a patent for it as well.
**Q:** At the time you signed your 131 declaration, you did know about Mr. Withers' application, right?
**A:** At -- in 2013, yes, I did. But at the time, when the original patent application was filed, I had no knowledge that Mr. Withers was trying to receive a patent for -- for Mr. McCoy and myself's design.
**Q:** I understand. So then the -- so then let me -- let me ask it this way: In 2013, at the time of your 131 declaration -- well, at that time neither Mr. Withers nor you had gotten a patent, correct?
**A:** I don't know if the -- when the exact patent app -- when it was actually approved, so . . . I knew the patent application had been applied for, but I don't know the date of when it was actually approved.
**Q:** You understand by the time of your 131 declaration, the patent had not been approved, right?
**A:** That I did not know at that time.
**Q:** Did you ever have any discussions with Mr. Withers about who was going to be seeking patent protection for the underbed hitch mounting system?
**A:** No, I did not.
**Q:** Okay. Never at any time?
**A:** Myself, personally, no. I do not know if anyone else within Cequent or Ford had conversations on that at all. I was not privy to that information.

(*Id*. at PageID 3916–3921,40:19–45:14. *See also id*. at PageID #: 3937, 61:17–20 ("Ford never had any information -- never had any design input on the shape of what we came up with or how it was constructed. That was all Mr. McCoy and myself."); *id*. at PageID #: 3968, 92:1–16 (expressing that he was upset to learn Mr. Withers had attempted to patent his and Mr. McCoy's invention).)

NSI claims it "was not permitted to fully address these issues during the IPR proceedings." (Dkt 107 at PageID #: 4042.) As shown above, this is (excuse the pun) patently untrue. Given Mr. Stanifer's existing testimony, what *more* is required to satisfy NSI's desire to "fully address these issues"? NSI's Opposition eludes rather than elucidates on this key issue.

Despite NSI's claim that it "has no desire to rehash the same topics" (Dkt 107 at PageID #: 4050), that is all it proposes to do—rehash and run up fees. Another Stanifer deposition is cumulative.

### C. NSI's Insistence That It Is Entitled to Post-Dismissal Discovery Was Never Litigated or Decided.

At the status conference, Horizon had not yet issued (and did not discuss with the Court) a covenant not to sue. NSI's counterclaims were not yet mooted. The premise upon which NSI claims it is entitled to discovery—its counterclaims—is gone. NSI has now taken the position that the question of post-judgment discovery was argued and decided by the Court. But post-judgment discovery and counterclaim discovery are drastically different issues.

NSI has identified no authority supporting the notion that it possesses any right to post-judgment discovery on dismissed counterclaims. The cavalcade of courts, including this Court, rejecting the notion that courts should allow collateral proceedings for the purpose of fee motions is resounding. *See Euclid Chem. Co. v. Vector Corrosion Techs., Inc.,* No. 05–80, 2008 WL 4404540, *5 (N.D. Ohio Sept. 24, 2008) ("[f]ee litigation is not to be used as a means for a party to litigate the substantive merits of the case."); *Aventis Cropscience, N.V. v. Pioneer Hi-Bred Int'l, Inc.*, 294 F. Supp. 2d 739, 743-44 (M.D.N.C. 2003) (collecting cases) ("major secondary disputes over attorneys' fees should be avoided"); *Dodge-Regupol, Inc. v. RB Rubber Products, Inc.*, 2010 WL 1342918, at *14–*15 (M.D. Pa. Mar. 31, 2010) (collecting cases) ("courts have been very reluctant to allow discovery on facts allegedly necessary to prove the exceptional nature of a case after its resolution.").

Even during ordinary discovery, the Federal Rules of Civil Procedure and the clearly established laws of this Circuit do not permit fishing expeditions like that proposed by NSI in the case of Mr. Stanifer. *In re Ohio Execution Protocol Litig*., 845 F.3d at 238 ("[W]e have never sanctioned blind-faith efforts to unearth the supposition of wrongdoing"). Mr. Stanifer already sat through nearly four hours of deposition by NSI on the same exact topics NSI proposes to address now. "'[E]ven very slight inconvenience may be unreasonable if there is no occasion for the

inquiry and it cannot benefit the party making it.'" *Serrano v. Cintas Corp.*, 699 F. 3d 884, 901 (6th Cir. 2012) (quoting 8A Charles Alan Wright & Arthur R. Miller et al., *Federal Practice & Procedure* § 2036 (3d ed. 2012)).

NSI's reckless accusations that Horizon is trying to hide something are completely unfounded. NSI had complete discovery of the relevant issues during the IPR and insists that it already has all the irrefutable evidence it needs to show entitlement to fees. Now is not the time for discovery on the merits of mooted claims. It is time for NSI to put up or shut up.

## CONCLUSION

NSI's Subpoena is procedurally improper, seeks only duplicative information, and creates an undue burden that is not proportionate to the needs of the litigation under Fed. R. Civ. P. 26(b)(1) given the current procedural posture of the case.

The Court should, accordingly, issue a protective order prohibiting the Stanifer subpoena and award Horizon its fees in connection with this motion.

Dated: April 11, 2025

Respectfully submitted,
*/s/Brendan E. Clark*

Christina J. Moser (0074817)
Email: cmoser@bakerlaw.com
Brendan E. Clark (085634)
Email: bclark@bakerlaw.com
Brian A. Troyer (059671)
Email: btroyer@bakerlaw.com

BAKER & HOSTETLER LLP
Key Tower
127 Public Square, Suite 2000
Cleveland, OH 44114-1214
Telephone: 216.621.0200
Facsimile: 216.696.0740
Attorneys for Plaintiff
Horizon Global Americas Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served on this 11th day of April 2025 via the Court's electronic filing system on all parties registered to receive service therefrom.

By: *_/s/Brendan E. Clark_*